249 F.2d 813
 ROCK-OLA MANUFACTURING CORPORATION, a Delaware corporation, Appellant,
v.
Dan M. WERTZ and Ernest C. Wetzel, individually and as partners doing business as Wertz Music Supply Company, Appellees.
 No. 7496.
 United States Court of Appeals Fourth Circuit.
 Argued October 16, 1957.
 Decided November 12, 1957.
 
 John S. Davenport, III, Richmond, Va. (Claude D. Minor, Richmond, Va., Louis M. Mantynband, and Henry J. Shames, Chicago, Ill., Denny, Valentine & Davenport, Richmond, Va., and Arvey, Hodes & Mantynband, Chicago, Ill., on the brief), for appellant.
 Wilbur M. Kessler, Richmond, Va. (John A. Cutchins and Cutchins, Wallinger, Wallace & Kessler, Richmond, Va., on the brief), for appellees.
 Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.
 SOBELOFF, Circuit Judge.
 
 
 1
 This litigation was begun in the District Court for the Eastern District of Virginia by a foreign corporation to recover a balance of $38,296.98 claimed to be due for merchandise. The defendants filed a preliminary motion to dismiss on the ground that the plaintiff, Rock-Ola Manufacturing Corporation, a Delaware corporation with plant and offices in Chicago, had failed to obtain a certificate of authority to transact business in Virginia, and that, as provided by the law of that State,[1] the action could not be maintained.
 
 
 2
 After taking evidence as to the relation between the parties and the nature and extent of the plaintiff's activity in Virginia, the District Judge, being of the opinion that the plaintiff was "doing business" there and was amenable to the statutory bar, granted the defendants' motion and entered judgment accordingly. The propriety of the dismissal is the sole question on the present appeal.
 
 
 3
 In Woods v. Interstate Realty Co., 1949, 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524, the Supreme Court put to rest all doubt as to the effect of qualification requirements upon the jurisdiction of Federal courts in diversity cases. If the doors of a State's courts are properly shut to a foreign corporation, it is now settled that the corporation is likewise barred from suing, on the basis of diversity of citizenship, in a Federal court sitting in that state. We turn, therefore, to a consideration of the business transactions between the parties, to determine whether it was the intent of the Virginia legislature to keep a plaintiff from its courts for failure to qualify in the circumstances of this case.
 
 
 4
 Plaintiff, Rock-Ola, manufactures and sells coin-operated phonographs, sometimes called "juke-boxes," and accessories. Throughout the United States, it has engaged forty distributors of its equipment, entering into annual written agreements appointing them to exclusive geographical territories. At one time, it had, in addition to such distributors, regional sales managers, among whom was one of the defendants, Dan M. Wertz, stationed in Virginia. This practice of maintaining managers has long since been abandoned, however, and Rock-Ola has no office in Virginia, no employees there, and no telephone in Virginia listed in its name. It owns no real property and maintains no warehouse in that State.
 
 
 5
 In 1940, the Virginia distributor was discharged for violation of his agreement and Wertz replaced him. From then until January, 1955, Rock-Ola and Wertz entered into annual distributor's agreements, and in June, 1955, when Wertz and Ernest C. Wetzel became partners, under the trade name Wertz Music Supply Company, they executed another such agreement with Rock-Ola.
 
 
 6
 In these agreements, Wertz Music Supply Company promised to maintain a clean and attractive showroom at its own expense. The Wertz firm hired its own employees and provided its own office and storeroom.
 
 
 7
 Rock-Ola furnished it with business cards and truck decals to be used as advertising matter, but the Wertz partnership was specifically directed not to use "Rock-Ola" as part of its trade name, or to employ any advertising matter with the Rock-Ola name unless approved by the plaintiff.
 
 
 8
 The Wertz Company promised to service all Rock-Ola machines in its territory, whether sold by it or the predecessor distributor, and to maintain, at its own expense, at least one competent repairman. On several occasions, usually at Wertz' request, Rock-Ola would send a field engineer to Virginia to instruct Wertz' repairmen in the repair of new Rock-Ola models.
 
 
 9
 The agreement further provided that the sales prices of all machines bought by Wertz Music Supply would be F.O.B. Chicago and that all parts sold to Wertz would be on C.O.D. terms. No parts were ever shipped C.O.D., however, and as Wertz testified, most of the machines and parts shipped to his company were immediately charged to its account, while Rock-Ola reserved the right, which it occasionally exercised, of sending goods on consignment.
 
 
 10
 Following a customary practice, Wertz sold the juke boxes to operators on conditional sales agreements, and after taking the buyers' promissory notes, would assign them to Rock-Ola. The latter accepted the assignments and credited the account of the partners, who remained secondarily liable as assignors. If an operator's account became overdue, he would be notified by the Wertz firm on Rock-Ola forms, of the obligation, and would be directed to remit thereafter to the manufacturer. On several occasions, when delinquencies accumulated, Rock-Ola's representatives visited the operators in an effort to bring about a reduction in their debts.
 
 
 11
 Some of the machines, purchased on account but not sold, were placed in Wertz' own "locations" as a competing operator. Other unsold machines Wertz leased to customer operators, and in such instances Wertz, as owner of the machine, would execute his own conditional sales contract and promissory note to Rock-Ola to secure his debt to it. At times Wertz would be asked to come to Chicago to discuss his indebtedness to Rock-Ola or to view new models which it was about to produce.
 
 
 12
 Rock-Ola fixed resale prices, although the distributor, having control over trade-ins, in effect set its own prices by allowing larger or smaller trade-ins. The Wertz Company paid its own expenses, bore its losses, and retained its profits.
 
 
 13
 Business may be done by a foreign corporation in one of two ways. It may engage the services of a local agent, whose acts may constitute the doing of business by the principal, though the act of appointing the agent is itself not sufficient to constitute doing business. People's Pittsburg Trust Co. v. Diebolt, 1932, 52 Idaho 208, 13 P.2d 656; 17 Fletcher, Cyclopedia of Corporations (1933), Sec. 8475, p. 496. Or, the foreign corporation may do such acts on its own part as amount to doing business.
 
 
 14
 The trial court's decision was based upon the conclusion that Wertz Music Supply was the agent of Rock-Ola and that it was "doing business" in Virginia through that agent.
 
 
 15
 No case bearing a close factual resemblance to ours deals directly with the amount and character of corporate activity that will require qualification to do business in Virginia. There is, however, a case, Carnegie v. Art Metal Construction Co., 1950, 191 Va. 136, 60 S.E.2d 17, strikingly similar to the one before us, in which the corporation's activity in Virginia was held insufficient to subject it to suit and service of process in the state.
 
 
 16
 Art Metal, a Massachusetts corporation with its principal office and factory in New York, had in Virginia no branch office, real property, bank account, or telephone listing. Sixteen business firms or persons were designated as its distributors in exclusive territories in Virginia. The distributors' purchases of merchandise were made directly from Art Metal, and deliveries were F.O.B. Art Metal's New York factory. The distributors paid their own expenses, bore their own losses, and retained their profits. The manufacturer supplied its dealers with catalogs, price lists, advertising blotters, displays, business cards, and stationery bearing the Art Metal letterhead. Two or three times a year, Art Metal's district manager would visit each of the sixteen Virginia distributors to assist in demonstrating its line and to acquaint them with new developments.
 
 
 17
 The Supreme Court of Appeals found that these distributors were in a vendor-vendee relationship with Art Metal and that Art Metal was not otherwise "doing business" in Virginia within the meaning of the Virginia service of process statute.
 
 
 18
 Without forgetting Justice Hudgins' admonition that the character of acts sufficient to constitute the doing of business may be different in service of process and qualification cases, under the latter, as well as the former, if the foreign corporation has an agent to whom it delegates an essential corporate function, the acts of the agent may constitute the doing of business by the principal. Tignor v. L. G. Balfour & Co., 1936, 167 Va. 58, 187 S.E. 468, 470, 472. So, on the issue of the relationship existing between the foreign corporation and its local distributor, the Art Metal case is direct authority here.
 
 
 19
 Although there are a few differences between this case and Art Metal, these are not persuasive factors tending to establish the existence of an agency relationship.
 
 
 20
 The defendant company lays stress upon the requirement to maintain a "clean, properly arranged and attractive showroom and office facilities at [its] own expense." Requirements of this nature, however, are intended merely to maintain the local good will of the foreign corporation and do not indicate agency here. In Shaw v. Jeppson, 1952, 121 Utah 155, 239 P.2d 745, the Supreme Court of Utah, in the face of a greater accumulation of such requirements imposed on a local concern, held that Arthur Murray was not "doing business" within the meaning of that State's qualification statute.
 
 
 21
 The same considerations may fairly be said to apply to Rock-Ola's requirement that Wertz shall repair all Rock-Ola machines in Virginia and maintain competent servicemen for that purpose. Other than an interest in the reputation of its product, Rock-Ola was not concerned. None of its money was invested in the repair enterprise, and it shared in none of the losses or profits. Rock-Ola dictated none of the details of the repair operation. As the record shows, it would even ship repair parts directly to machine operators, when so requested by them, thus indicating an interest only in the satisfactory working condition of machines of its manufacture, and not an interest in the business of repairing.
 
 
 22
 Rock-Ola's practice of taking assignments of conditional sales contracts from Wertz tended, as the District Court itself found, away from agency rather than toward it. The assignment of the conditional sales contracts left Wertz with a secondary liability to Rock-Ola. This is a debtor-creditor relationship rather than one of agency. As the Judge correctly observed: "* * * by reason of his [Wertz's] guaranty of the contracts, his personal liability was greater than that of an ordinary agency relationship."
 
 
 23
 The consignment of goods might, in some circumstances, suggest agency relationship; but since most of the goods here were sold F.O.B. Chicago, and even the consignments were not on a commission basis, the combined effect is to reduce the consignment feature to a weight insufficient for an inference substantially different from that drawn in Carnegie v. Art Metal Construction Co.
 
 
 24
 It would be error, under Virginia law, we think, to reach a different result in the present case. Wertz was not the agent of Rock-Ola through whom the latter did business in Virginia, but was independently in business.
 
 
 25
 We are not unmindful of our decision in Kahn v. Maico Co., 4 Cir., 1954, 216 F.2d 233. That case, however, was substantially different in its facts, in that Maico exercised greater control over its distributor than did Rock-Ola over Wertz.
 
 
 26
 Having found that Wertz was not Rock-Ola's agent, we must next apply the second test of "doing business," i.e., whether Rock-Ola's own activities in Virginia justify a conclusion that Rock-Ola was doing business there.
 
 
 27
 We have found no Virginia case on the question of shipments on consignment constituting the "doing of business." The general rule, however, is that such shipments do not amount to "doing business" by the foreign corporate consignor. This is so notwithstanding an agreement by the consignee to insure, as in this case, and even when, unlike this case, the consignee receives commissions. Once the goods have reached the consignee, it is generally considered that any business done in regard to them is that of the consignee. 17 Fletcher, Cyclopedia of Corporations (1933), Sec. 8484, p. 520, et seq.; Superior Concrete Accessories, Inc., v. Kemper, Mo. 1955, 284 S.W.2d 482.
 
 
 28
 It is plain on this record that while Wertz assigned the conditional sales contracts in Virginia, they were accepted by Rock-Ola in Chicago. The acceptance of such assignments, even when done in the ordinary course of the foreign corporation's business, is not an act of "doing business" within the qualification requirements. Sending agents into the state to collect debts owing to the assignee, also does not constitute doing business, the collection being incidental to the assignment, the acceptance of which was not the doing of business. 17 Fletcher, Cyclopedia of Corporations, (1933), Sec. 8492, p. 542; General Motors Acceptance Corp. v. Lund, 1922, 60 Utah 247, 208 P. 502; Continental Assurance Co. v. Ihler, 1933, 53 Idaho 612, 26 P.2d 792; Siwooganock Guaranty Savings Bank v. Cushman, 1937, 109 Vt. 221, 195 A. 260.
 
 
 29
 The above discussion covers the dominant features of the plaintiff's activities in Virginia, and finding nothing else that could possibly be regarded as "doing business," we conclude that neither what Rock-Ola did itself nor what it did through the distributor, amounted to doing business in the State. And viewing all such activities together, we hold that in their totality they were not sufficient to subject the corporation to the qualification statute, and so, failure to qualify will not bar the corporation from maintaining this suit.
 
 
 30
 In this view, our decision rests upon the interpretation of the statute itself. Finding that Virginia did not intend to exercise jurisdiction in these circumstances, we do not reach constitutional problems as to a State's powers over interstate commerce, which might have arisen if the statute had been otherwise construed.
 
 
 31
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 3 Va.Code (1950), Sec. 13-211:
 "Every corporation incorporated under a jurisdiction beyond the limits of this State (and hereinafter designated as a foreign corporation) shall, before doing business in this State * * * obtain from the Commission a certificate of authority to transact business in the State. * * *?"
 Ibid, Sec. 13-218:
 "No such corporation shall recover any money or property or enforce any contract in any court without first obtaining the certificate of authority to do business in this State provided for in § 13-211 * * *?"
 These same requirements are codified presently in Secs. 13.1-102 and 13.1-119, 3 Va.Code (1956 replacement volume).